2015-1124

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

CSP TECHNOLOGIES, INC.,

*Plaintiff-Appellant,*

*v.*

SÜD-CHEMIE AG, SÜD-CHEMIE, INC.,
AIRSEC S.A.S., CLARIANT PRODUKTE
DEUTSCHLAND GMBH, CLARIANT CORPORATION,
CLARIANT PRODUCTION (FRANCE) S.A.S.,

*Defendants-Appellees.*

Appeal from the United States District Court for the Southern District of Indiana in
Case No. 4:11-cv-00029, Chief Judge Richard L. Young

## BRIEF FOR APPELLEES

Paul H. Berghoff
Paula S. Fritsch
MCDONNELL BOEHNEN HULBERT
   & BERGHOFF LLP
300 S. Wacker Drive
Chicago, IL 60606
(312) 913-0001

Sean M. Sullivan
J. Dan Smith
LEE SULLIVAN SHEA
   & SMITH LLP
150 South Wacker Drive
Chicago, IL 60606
(312) 754-9602

May 13, 2015

*Attorneys for Defendants-Appellees*
*Süd-Chemie AG, Süd-Chemie, Inc., Airsec*
*S.A.S., Clariant Produkte Deutschland*
*GmbH, Clariant Corporation, and*
*Clariant Production (France) S.A.S.*

# CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees, Süd-Chemie AG, Süd-Chemie, Inc., Airsec S.A.S., Clariant Produkte Deutschland GmbH, Clariant Corporation, and Clariant Production (France) S.A.S., certifies the following:

1.    The full name of every party or amicus represented by me is:

   Süd-Chemie AG, Süd-Chemie, Inc., Airsec S.A.S., Clariant Produkte Deutschland GmbH, Clariant Corporation, and Clariant Production (France) S.A.S.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Clariant Produkte Deutschland GmbH, Clariant Corporation, and Clariant Production (France) S.A.S.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Süd-Chemie AG, Süd-Chemie, Inc., and Airsec S.A.S. no longer exist, having been merged into Clariant Produkte Deutschland GmbH, Clariant Corporation, and Clariant Production (France) S.A.S., respectively.  Each of Clariant Produkte Deutschland GmbH, Clariant Corporation, and Clariant Production (France) S.A.S. is a wholly owned subsidiary of their ultimate parent, Clariant AG, whose shares are publicly traded on the SIX Swiss Exchange.  No publicly held company owns 10 percent or more of the stock of Clariant AG.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP: Paul H. Berghoff and Paula S. Fritsch;

LEE SULLIVAN SHEA & SMITH LLP: Sean M. Sullivan and J. Dan Smith (both formerly of MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP); and

BARNES & THORNBURG LLP: Jan M. Carroll.

Respectfully submitted,

Dated: May 13, 2015                     By: /s/Sean M. Sullivan
                                         Sean M. Sullivan
                                         J. Dan Smith
                                         LEE SULLIVAN SHEA
                                            & SMITH LLP
                                         150 South Wacker Drive
                                         Chicago, IL 60606
                                         (312) 754-9602

                                         Paul H. Berghoff
                                         Paula S. Fritsch
                                         MCDONNELL BOEHNEN HULBERT
                                            & BERGHOFF LLP
                                         300 S. Wacker Drive
                                         Chicago, IL 60606
                                         (312) 913-0001

                                         *Attorneys for Defendants-Appellees Süd-Chemie AG, Süd-Chemie, Inc., Airsec S.A.S., Clariant Produkte Deutschland GmbH, Clariant Corporation, and Clariant Production (France) S.A.S.*

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES.................................................................1

COUNTER-STATEMENT OF THE ISSUES ....................................................3

COUNTER-STATEMENT OF THE CASE .......................................................4

COUNTER-STATEMENT OF THE FACTS......................................................6

I.   BACKGROUND INFORMATION ...........................................................6

II.   THE '137 PATENT ..................................................................................8

SUMMARY OF ARGUMENT.......................................................................11

ARGUMENT ................................................................................................14

I.   THE DISTRICT COURT CORRECTLY CONSTRUED THE "UPPER
     HOUSING" LIMITATION.....................................................................14

     A.   The Specification Implicitly Defines The "Upper Housing" As
          Separate And Distinct From The Base.............................................15

     B.   The Language Of The Asserted Claims Supports The District
          Court's Construction.......................................................................24

     C.   The Prosecution History Further Confirms That The "Upper
          Housing" Limitation Should Be Construed To Require A Two-
          Piece Container ...............................................................................29

II.   CSP'S INTERPRETATION OF THE "UPPER HOUSING"
     LIMITATION VIOLATES THE PRINCIPLES OF CLAIM
     CONSTRUCTION AND IS BASED ON AN INCORRECT
     READING OF THE '137 PATENT .........................................................34

     A.   CSP's Construction Improperly Reads The Term "Housing" Out
          Of The Claims..................................................................................34

     B.   CSP's Construction Improperly Relies On The Term "Portion"...........38

C.   The '137 Patent Does Not Disclose A One-Piece Container With An "Upper Housing"..........................................................................40

III.   THE DISTRICT COURT DID NOT IMPROPERLY RELY ON EXTRINSIC EVIDENCE, MISREAD THE CLAIMS, IMPORT LIMITATIONS FROM THE SPECIFICATION, OR EXCLUDE A PREFERRED EMBODIMENT ....................................................42

A.   The District Court's Dictionary Use Was Proper ..................................42

B.   The District Court's Reading Of The Asserted Claims Was Correct........................................................................................43

C.   The District Court Did Not Import A Limitation From The Specification Into The Claims .........................................................44

D.   The District Court's Claim Construction Does Not Exclude A Preferred Embodiment ..........................................................46

IV.   THE DISTRICT COURT CORRECTLY BARRED CSP FROM ASSERTING INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS ....................................................................48

A.   The Disclosure-Dedication Rule Bars CSP From Asserting Infringement Under The Doctrine Of Equivalents ...........................48

1.   The Disclosure-Dedication Rule .................................................48

2.   CSP Disclosed But Did Not Claim An Alternative One-Piece Container Like Clariant's Accused Product ..................50

3.   The District Court's Claim Construction Is Not Inconsistent With Its Application Of The Disclosure-Dedication Rule .......55

4.   CSP's Cases Confirm The Standard Set Forth In *Johnson & Johnston* and *PSC*...................................................56

B.   The Vitiation Doctrine Bars CSP From Asserting Infringement Under The Doctrine Of Equivalents ..................................................60

1.   The Vitiation Doctrine..................................................................60

2.  Clariant's Accused One-Piece Container Is The Antithesis Of The Claimed Multipart Container .......................................62

3.  CSP's Expert's Doctrine of Equivalents Analysis Is Misleading ...............................................................................63

CONCLUSION ..................................................................................66

STATEMENT OF ORAL ARGUMENT................................................67

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) .................................................. 36, 37

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
632 F.3d 1246 (Fed. Cir. 2011) ........................................................ 28

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010) ....................................................... 20

*Asyst Techs., Inc. v. Emtrak, Inc.*,
402 F.3d 1188 (Fed. Cir. 2005) ....................................................... 61

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
262 F.3d 1258 (Fed. Cir. 2001) .................................................. 20, 45

*Brilliant Instruments, Inc. v. GuideTech, LLC*,
707 F.3d 1342 (Fed. Cir. 2013) ....................................................... 61

*Callicrate v. Wadsworth Mfg., Inc.*,
427 F.3d 1361 (Fed. Cir. 2005) ....................................................... 37

*Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*,
723 F.3d 1376 (Fed. Cir. 2013) ....................................................... 60

*Conopco, Inc. v. May Dep't Stores Co.*,
46 F.3d 1556 (Fed. Cir. 1994) ......................................................... 49

*CSP Techs., Inc. v. Sud-Chemie AG*,
578 F. App'x 993 (Fed. Cir. 2014) ..................................................... 1

*Deere & Co. v. Bush Hog, LLC*,
703 F.3d 1349 (Fed. Cir. 2012) .................................................. 60, 61

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005) ................................................... 25, 44

*Eon-Net LP v. Flagstar Bancorp*,
    653 F.3d 1314 (Fed. Cir. 2011) ....................................... 19, 23, 44, 45

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
    93 F.3d 1572 (Fed. Cir. 1996) .................................................... 28, 44

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
    64 F.3d 1553 (Fed. Cir. 1995) .......................................................... 36

*Gaus v. Conair Corp.*,
    363 F.3d 1284 (Fed. Cir. 2004) ................................................... 24, 26

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008) ........................................................ 47

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
    558 F.3d 1368 (Fed. Cir. 2009) ............................................. 19, 21, 45

*Int'l Rectifier Corp. v. IXYS Corp.*,
    361 F.3d 1363 (Fed. Cir. 2004) ........................................................ 28

*Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc.*,
    285 F.3d 1046 (Fed. Cir. 2002) ........................................... 49, 53, 54

*K-2 Corp. v. Salomon S.A.*,
    191 F.3d 1356 (Fed. Cir. 1999) ................................................... 48, 49

*Laserfacturing, Inc. v. Old Carco Liquidation Trust*,
    494 F. App'x 72 (Fed. Cir. 2012) ............................................... 20, 45

*Lucent Techs., Inc. v. Gateway, Inc.*,
    525 F.3d 1200 (Fed. Cir. 2008) ........................................................ 47

*Mangosoft, Inc. v. Oracle Corp.*,
    525 F.3d 1327 (Fed. Cir. 2008) ................................................... 36, 43

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) .................................................... 14, 15

*Maxwell v. J. Baker, Inc.*,
  86 F.3d 1098 (Fed. Cir. 1996) ........................................... 49

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005) ........................................ 21

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005) ........................................ 35

*Miller v. Bridgeport Brass Co.*,
  104 U.S. 350 (1881) ............................................................ 48

*Moore U.S.A., Inc. v. Standard Register Co.*,
  229 F.3d 1091 (Fed. Cir. 2000) ........................................ 61

*Nike Inc. v. Wolverine World Wide, Inc.*,
  43 F.3d 644 (Fed. Cir. 1994) ............................................. 35

*Pfizer, Inc. v. Teva Pharm., USA, Inc.*,
  429 F.3d 1364 (Fed. Cir. 2005) ........................................ 57, 58, 60

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ................................... passim

*Planet Bingo, LLC v. GameTech Int'l, Inc.*,
  472 F.3d 1338 (Fed. Cir. 2006) ........................................ 61

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
  400 F.3d 901 (Fed. Cir. 2005) ........................................... 37

*Praxair, Inc. v. ATMI, Inc.*,
  543 F.3d 1306 (Fed. Cir. 2008) ........................................ 43

*PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*,
  355 F.3d 1353 (Fed. Cir. 2004) ........................................ 49, 50, 58

*Sage Prods., Inc. v. Devon Indus., Inc.*,
    126 F.3d 1420 (Fed. Cir. 1997) ........................................................ 49

*SanDisk Corp. v. Kingston Tech. Co., Inc.*,
    695 F.3d 1348 (Fed. Cir. 2012) ............................................... 58, 59, 60

*Shire Dev., LLC v. Watson Pharm., Inc.*,
    135 S.Ct. 1174 (2015) ..................................................................... 25

*Shire Dev., LLC v. Watson Pharm., Inc.*,
    746 F.3d 1326 (Fed. Cir. 2014) .................................................. 25, 44

*Smith v. Magic City Kennel Club, Inc.*,
    282 U.S. 784 (1931) ......................................................................... 34

*Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*,
    611 F.3d 1381 (Fed. Cir. 2010) ........................................................ 33

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    135 S.Ct. 831 (2015) ................................................................... 25, 43

*Toro Co. v. White Consol. Indus., Inc.*,
    383 F.3d 1326 (Fed. Cir. 2004) ........................................................ 50

*Virnetx, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ........................................................ 19

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..................................... 14, 20, 43, 45

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*,
    520 U.S. 17 (1997) ..................................................................... 49, 61

*Wleklinski v. Targus, Inc.*,
    258 F. App'x 325 (Fed. Cir. 2007) ........................................ 61, 62, 63

*Zircon Corp. v. Stanley Black & Decker, Inc.*,
    452 F. App'x 966 (Fed. Cir. 2011) .............................. 20, 23, 24, 33

**OTHER AUTHORITIES**

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 603 (11th ed. 2006) .................. 28

## STATEMENT OF RELATED CASES

This case was previously appealed by Appellant CSP Technologies, Inc. ("CSP") as Case No. 2014-1337, before Chief Judge Prost, and Circuit Judges Dyk and Moore. That appeal was dismissed on October 6, 2014 before briefing commenced. *CSP Techs., Inc. v. Sud-Chemie AG*, 578 F. App'x 993 (Fed. Cir. 2014).

Counsel for Appellees Süd-Chemie AG, Süd-Chemie Inc., Airsec S.A.S., Clariant Produkte Deutschland GmbH, Clariant Corporation, and Clariant Production (France) S.A.S. (collectively "Clariant") are not aware of any pending appeals before this Court that would directly affect or be directly affected by the Court's decision in this appeal.

There is one case pending in the United States District Court for the Southern District of Indiana, *CSP Techs., Inc. v. Clariant Produkte Deutschland GmbH*, No. 4:13-cv-0142 (S.D. Ind. filed Sept. 10, 2013), which may be affected by the Court's decision in this appeal. That case involves U.S. Patent No. 8,528,778 ("the '778 Patent"), which is a continuation of the patent that is the subject of the instant appeal, U.S. Patent No. 7,537,137 ("the '137 Patent"). The '778 Patent is also the subject of an *Inter Partes* Review ("IPR") before the Patent and Trial Appeal Board ("PTAB"), *Clariant Corp. v. CSP Techs., Inc.*, IPR2014-

00375.  The PTAB instituted that IPR on June 12, 2014 and a final judgment is

expected on or before June 12, 2015.

## <u>COUNTER-STATEMENT OF THE ISSUES</u>

1.     Whether the District Court correctly construed the claim limitation "an upper housing portion of the container" to mean "an upper housing portion of the container that is separate and distinct from the container base"?

2.     Whether the District Court correctly granted summary judgment of noninfringement based on either the disclosure-dedication doctrine or the vitiation doctrine?

## COUNTER-STATEMENT OF THE CASE

Having lost its bid to acquire Süd-Chemie's container business to Clariant in early 2011, CSP initiated a global attack on Clariant, suing Clariant for infringement of the '137 Patent in the District Court for the Southern District of Indiana ("the District Court") and in the U.S. International Trade Commission ("ITC"), and for infringement of the European counterpart of the '137 Patent in the German and French courts.  None of these cases had any merit.  Tellingly, CSP unilaterally withdrew the German and ITC cases shortly after initiating them, and both the French court and the European Patent Office ruled in Clariant's favor and found the European counterpart of the '137 Patent invalid over the prior art.[1]  The District Court here also ruled in Clariant's favor, which resulted in CSP filing the present appeal.  A0037-38.

The District Court correctly determined that Clariant's Accused Product does not infringe any asserted claim.  A0024-36.  Specifically, the Accused Product lacks "an upper housing portion of the container," which the District Court correctly construed as a piece of the container that is separate and distinct from the claimed "container base."    A0012-14.  Instead, the Accused Product has a one-piece container without an "upper housing," as shown below:

---

[1] CSP's Statement of the Case conveniently ignores these recent cases related to the '137 Patent and instead focuses on an unrelated 2003 case between the parties involving the chemical composition of a desiccant-entrained liner.



Lid

One-Piece
Container

A1589-644 at A1641 (annotated).

CSP has conceded that, under the District Court's construction, the Accused

Product does not literally infringe any of the asserted '137 Patent claims.  A0028;

*see also* A3249 at n. 6.  And, as the District Court correctly determined, there can

be no infringement of the asserted claims under the doctrine of equivalents as a

matter of law.  Specifically, CSP is barred from asserting the doctrine of

equivalents against Clariant's Accused Product under both the disclosure-

dedication rule and the vitiation doctrine.  A0036.

## COUNTER-STATEMENT OF THE FACTS

**I.     BACKGROUND INFORMATION**

The '137 Patent generally relates to container and lid assemblies that can be used to store and package moisture-sensitive items.  This was a crowded art practiced by many different entities—including CSP and Clariant—well before CSP filed the '137 Patent.  Indeed, this art goes back over 50 years and includes products such as the iconic and ubiquitous plastic Tupperware® containers and 35 mm film canisters.  *See* A1663-728 at A1670-71; A1596-97.  A picture of such a prior art film canister with a one-piece container is shown below:



A1597 (annotated).

By as early as 1996, CSP had also designed container and lid assemblies with one-piece containers that could be used to store and package moisture-

sensitive items. CSP's 1996 International Publication No. WO 96/33108, entitled

"Desiccant Material Included in a Closed Container," discloses one such example:



A0357-76 at A0372, Fig 1 (annotated).

Likewise, prior to the filing of the '137 Patent, Clariant had independently

developed its own container and lid assemblies with one-piece containers for the

packaging of diagnostic test strips. One such container and lid assembly (shown

below) was offered for sale in the United States as early as July 2001. *See* A1671-

73 at A1672, ¶ 29.



Lid

One-Piece
Container

A1705 (annotated).  This commercial prior art container and lid assembly had all

the same relevant features as Clariant's Accused Product in this case.  *See* A1671-

73 at A1672, ¶ 29; A1705-08.

## II.    THE '137 PATENT

The '137 Patent was filed on June 30, 2005 as a continuation-in-part of U.S.

Patent No. 7,213,720 ("the '720 Patent"), which in turn claims priority to

Provisional Application No. 60/417,533, filed on October 10, 2002.  A0041-55 at

A0041, ¶¶ 22, 60, 63.  The '137 Patent is a continuation-in-part of the '720 Patent

because CSP added new matter to the '137 Patent at the time of filing.

One of the key differences between the '720 and '137 Patents is that neither the specification nor the claims of the parent '720 Patent included the term "upper housing." *See* A1464-1478. That term was added to the specification of the '137 Patent in eleven (11) places to describe a two-piece container assembly with an "upper housing" and a separate and distinct "base," and to expressly distinguish such a two-piece container from a one-piece container without an "upper housing." *Compare* A0041-55 *with* A1464-1478; *see also* A1809-17. As one example, the '137 Patent specification states:

> ***In one embodiment***, the containers can be formed as a ***single closed unit***, with the hinge joining the lid portion to the container portion.

> ***In yet another embodiment***, the container ***assembly*** comprising the ***base and upper housing portion*** can be ***molded separately***.

A0053 at 4:4-9 (emphasis added). These two alternative types of containers are shown in Figures 10 and 6 of the '137 Patent, respectively:

**One-Piece Container**    **Two-Piece Container**



A0047 at Figure 10 (annotated); A0044 at Figure 6 (annotated).

In addition to adding "upper housing" to the specification, CSP also added "upper housing" to all of the '137 Patent claims. A0054-55 at Claims 1-7. By doing so, CSP intentionally limited the '137 Patent claims to a two-piece container with an "upper housing" and a separate and distinct "base."

## SUMMARY OF ARGUMENT

This appeal turns on the meaning of the claim term "upper housing portion of the container," a term that limits all the claims of the '137 Patent. In construing this term, the District Court reviewed the intrinsic record and held that the upper housing portion of the container must be "separate and distinct from the container base." CSP admitted that since the Accused Product has a one-piece container, it cannot literally infringe the claims of the '137 Patent given the District Court's construction of the "upper housing" limitation.

The District Court's construction is fully supported by the intrinsic record. As is often the case, the specification here provides the best and dispositive guide to the meaning of this claim term. Though the specification does not explicitly define "upper housing," it defines this term implicitly by repeatedly and consistently referring to the "upper housing" as a distinct piece of a multi-piece container that is separate from the container base. In fact, *every* reference to "upper housing" in the specification refers to the upper housing as being a separate piece from the container base.

The Abstract unambiguously describes the patented container as an "assembly" having two separate and distinct pieces—"a base portion" and "an upper housing portion—that can be "snap-fit" together."

> [T]he container *assembly* further comprising *a base portion* and *an upper housing portion*, the upper housing portion is capable of being *snap-fit into* the base portion . . . .

A0041 at Abstract (emphasis added).  The Summary of the Invention confirms that the upper housing is a separate piece from the base.

> The *assembly* comprises *a base* and *an upper housing* that can be *molded separately*, the base can be loaded with the item to be retained in the container, and then the base and upper housing can be *snap-fit together* employing a lip seal in order to provide moisture-tightness.

A0052 at 2:26-30 (emphasis added).  And the Detailed Description of the Embodiments again describes the upper housing portion as separate and distinct from the base.

> In yet another embodiment, the container *assembly* comprising the *base* and *upper housing portion* can be *molded separately*.  As such, in one example, the base portion can be loaded with the item(s) to be retained in the container *assembly*, and then the upper housing portion can be *snap-fit with* the base . . . .

A0053 at 4:7-12 (emphasis added); *see also id*. at 3:7-9; 4:46-5:41.  Equally persuasive is that when the specification of the '137 Patent refers to a one-piece container, it pointedly avoids using the term "upper housing" or "housing" to describe the container.  This is because the one-piece container does not have an "upper housing."

The claim language itself, as well as the dictionary definition of "housing" cited by the District Court, also supports the District Court's construction of the "upper housing" limitation.  Likewise, the prosecution history confirms that the

- 12 -

claimed "upper housing" is separate and distinct from the container "base." The term "upper housing" was intentionally added to the specification of the '137 Patent in a continuation-in-part application. During prosecution, CSP at first limited all of the claims to require an "upper housing," then removed the limitation, and finally reinserted the requirement for an upper housing in all of the issued claims. This prosecution history evidences CSP's intent to limit its claims to a multi-piece container with separate and distinct upper housing and base pieces.

Accordingly, Clariant respectfully asks this Court to affirm the District Court's construction.

The District Court also correctly found that CSP is precluded as a matter of law from relying on infringement under the doctrine of equivalents based on either the disclosure-dedication rule or the vitiation doctrine. Since the '137 Patent discloses but does not claim the alternative embodiment of a one-piece container, the disclosure-dedication bars CSP from using the doctrine of equivalents to cover Clariant's Accused Product. Alternatively, because CSP's argument for equivalence would render the "upper housing" limitation meaningless by sweeping in all containers (including the one-piece antithesis of the claimed multi-piece container), CSP's reliance on the doctrine of equivalence would also violate the vitiation doctrine. On either basis, Clariant respectfully asks this Court to affirm the District Court's summary judgment of no infringement.

**ARGUMENT**

## I.    THE DISTRICT COURT CORRECTLY CONSTRUED THE "UPPER HOUSING" LIMITATION

The District Court correctly construed the claim term "an upper housing portion of the container" to mean "an upper housing portion of the container that is separate and distinct from the container base."  Since *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), this Court has repeatedly reiterated that "the ordinary and customary meaning" of a claim term is determined by looking at how one of ordinary skill in the art would have understood that term in the context of the intrinsic evidence, which includes the claims themselves, the specification, and the prosecution history.  *See, e.g.*, *id.* at 1312-17.  Relevant extrinsic evidence such as dictionary definitions may also be considered.  *Id.* at 1324.

According to *Phillips*, the "claims 'must be read in view of the specification, of which they are a part.'"  *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)).  In fact, the specification "is the single best guide to the meaning of a disputed term"; "[u]sually, it is dispositive."  *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  And as noted by this Court, "the context in which a term is used in the asserted claim can be highly instructive."  *Phillips*, 415 F.3d at 1314.

In addition, a court should consider the patent's prosecution history.  *Id.* at 1317 (citing *Markman*, 52 F.3d at 980).  "[T]he prosecution history can often

inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id*.

While the intrinsic evidence is highly relevant, extrinsic evidence may also be consulted and relied upon as long as it does not contradict claim meaning that is unambiguous in light of the intrinsic record. *Id*. at 1317-24. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id*. at 1317 (quoting *Markman*, 52 F.3d at 980). As stated by this Court in *Phillips*, "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words . . . ." *Id*. at 1322.

As explained in detail below, the evidence here fully supports the District Court's construction.

### A.    The Specification Implicitly Defines The "Upper Housing" As Separate And Distinct From The Base

The '137 Patent specification provides a clear and dispositive guide to the meaning of the claim term in dispute. On reading the specification, a person of ordinary skill in the art would understand that "upper housing portion" refers to the upper piece of a multi-piece container that is separate and distinct from the base. This is because the '137 Patent specification repeatedly and uniformly describes

the claimed "upper housing" and "container base" as two separate and distinct

pieces of a container assembly that are molded separately and then joined (*e.g.*,

snap fit) together to form a two-piece container.

Starting with the Abstract on the first page, the '137 Patent unambiguously

describes the patented container as an "assembly" having two separate pieces—a

"base portion" and an "upper housing portion"—and explains that these two

separate pieces can be "snap-fit" together.

> [T]he container ***assembly*** further comprising ***a base portion*** and ***an upper housing portion***, the upper housing portion is capable of being ***snap-fit into*** the base portion . . . .

A0041 at Abstract (emphasis added).  The specification's characterization of such

a container as an "assembly" indicates that the "upper housing" and "base" are

separate and distinct container pieces that are joined together (*i.e.*, assembled).

The next reference to "upper housing" occurs in the Summary of the

Invention.

> The ***assembly*** comprises ***a base*** and ***an upper housing*** that can be ***molded separately***, the base can be loaded with the item to be retained in the container, and then the base and upper housing can be ***snap-fit together*** . . . .

A0052 at 2:26-30 (emphasis added).  Here again, the "upper housing" is part of a

two-piece assembly.  Moreover, this disclosure explains that the upper housing is

"molded separately" from the base before the two separate pieces are joined

together.

- 16 -

In the Detailed Description of the Embodiments, the specification again describes the upper housing portion as separate and distinct from the base.

> In yet another embodiment, the container *assembly* comprising the *base* and *upper housing portion* can be *molded separately*. As such, in one example, the base portion can be loaded with the item(s) to be retained in the container *assembly*, and then the upper housing portion can be *snap-fit with* the base . . . .

A0053 at 4:7-12 (emphasis added); *see also id*. at 3:7-9; 4:46-5:41.

The figures in the '137 Patent only strengthen the specification's teaching that an upper housing is a separate piece from the base. Colorized versions of Figures 2 and 6 of the '137 Patent are provided below, which each illustrate an "upper housing" (shown in pink) and a "container base" (shown in yellow) as two separate and distinct pieces that can be joined together to form a two-piece container assembly:



FIG. 2



FIG. 6

A0043 at Figure 2 (annotated); A0044 at Figure 6 (annotated); *see also* A0045 at Figure 7; A0050 at Figure 13B.

Further, Figure 14 is "a cross-sectional view of an enlarged section of one end of the base and upper housing assembly illustrating the snap lip seal."  A0051; A0053 at 3:7-9.  In describing this figure, the specification again confirms that the base and upper housing pieces form a "container assembly" where "the base portion is snap sealed with the upper housing portion."  A0053 at 4:26-27.  In order to be "snap sealed" together, the base portion and upper housing portion must be separate pieces.

As the District Court correctly explained in its Entry on Claim Construction, "each time the specification uses the term 'upper housing' to describe the

container, the specification describes the container as having an upper housing and a separate and distinct container base." A0014; *see also* A0041 at Abstract; A0052 at 2:26-30; A0053 at 3:7-9; A0053 at 4:7-12; A0053 at 4:18-28.

In cases like this, where the specification repeatedly and consistently describes a claim term one way, this Court has construed the term in accordance with this description. Thus, the "upper housing" limitation was properly construed by the District Court as a piece of the container that is separate and distinct from the "container base." *See ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374-75 (Fed. Cir. 2009) (construing the term "spike" to require a "pointed tip for piercing the seal" because the "specification repeatedly and uniformly describes the spike as a pointed instrument for the purpose of piercing a seal") (internal quotation marks omitted); *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1318 (Fed. Cir. 2014) (construing the term "secure communication link" to require "concealment" (or "anonymity") because "[t]he concealment requirement appears throughout the specification and is implicated in every [relevant] embodiment"); *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1321 (Fed. Cir. 2011) (construing the terms "document" and "file" as being "limited to information that originates from a hard copy document" because "the written description repeatedly and consistently defines the invention as a system that processes information derived from hard copy documents"); *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1052

(Fed. Cir. 2010) (construing the term "budesonide composition" to require "budesonide dispersed in a solvent" because "[t]he specification consistently describes the budesonide compositions in that way") (internal quotation marks omitted); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1270-73 (Fed. Cir. 2001) (construing the term "plurality of different modes" to be limited to "only three possible permutations" because "the patentees defined the term 'mode' [that way] by implication, through the term's consistent use throughout the '786 patent specification." (citing *Vitronics*, 90 F.3d at 1582)); *Laserfacturing, Inc. v. Old Carco Liquidation Trust*, 494 F. App'x 72, 75 (Fed. Cir. 2012) (construing the term "sheets" to require a "broad thin piece of material with generally uniform thickness" because "[t]he patent consistently discusses the term 'sheets'" in that way) (internal quotation marks omitted); *Zircon Corp. v. Stanley Black & Decker, Inc.*, 452 F. App'x 966, 976-78 (Fed. Cir. 2011) (construing the term "ratio" to be limited to the "result of dividing two values" because "[t]he specification repeatedly and consistently uses the word 'ratio' to describe division") (internal quotation marks omitted).

The '137 Patent specification also describes how this two-piece container configuration is functionally advantageous in that it allows the "upper housing" and "base" pieces to be molded separately so that the base can be loaded with items before the base and upper housing are joined together.  A0052 at 2:23-31;

A0053 at 4:7-12.  This advantageous function further confirms that the claims require a two-piece container.  *See ICU Med.,* 558 F.3d at 1375 ("[I]t is 'entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language.'" (quoting *Medrad, Inc. v. MRI Devices Corp.,* 401 F.3d 1313, 1319 (Fed. Cir. 2005))).

In contrast to the two-piece containers described above, the '137 Patent *never* uses the term "upper housing" (or "housing") in connection with any discussion of a one-piece container, nor does the '137 Patent show a one-piece container with an "upper housing."  *See* A0041-55; CSP Brief at p. 31 (CSP admitting that "the specification does *not* specifically use the phrase 'upper housing portion' in the section of the specification describing the one-piece vial shown in Figure 10." (emphasis added)).  For example, the entire description of the one-piece container shown in Figures 10 and 11 never uses the term "upper housing," but instead focuses solely on the sealing arrangement between the "lid portion" and the one-piece "container portion":

> In yet another embodiment, shown in FIGS. 10 and 11, the structure of the lip 22' has a distal end 27' provided with an extension 28'. The skirt 26' has a recess 23' positioned near where the skirt extends from the base portion 24'. The recess 23' is adapted to receive the extension 28' when the lid portion is closed upon the container portion. When the lid portion is closed on the container portion, the abutting arrangement between the lip and the skirt, and presence of the extension within the recess, forms a substantially moisture tight seal. FIG. 11 shows the configuration for such an arrangement.

A0053 at 3:29-38. Likewise, Figure 10 itself does not provide any indication that

the one-piece container portion includes an "upper housing":



FIG. 10

A0047 at Figure 10 (annotated).[2]

    In addition to never using the term "upper housing" to describe a one-piece

container, the specification of the '137 Patent explicitly distinguishes between a

one-piece container without an "upper housing" (*e.g.*, Figure 10) and a two-piece

container with an "upper housing" (*e.g.*, Figure 2):

> In one embodiment, the containers can be formed as a single closed
> unit, with the hinge joining the lid portion to the container portion. In
> yet another embodiment, the container assembly comprising the base
> and upper housing portion can be molded separately.

*See* A0053 at 4:4-9.

    The '137 Patent specification (1) consistently and only uses the claim term

"upper housing" to describe a two-piece container having an "upper housing" and

a separate and distinct "base," (2) never uses the claim term "upper housing" to

---

[2] Figure 11 merely shows the hinge of Figure 10 in greater detail. *See* A0048 at
Figure 11; A0053 at 3:1-2.

describe a one-piece container, (3) never shows a one-piece container with an "upper housing," and (4) explicitly distinguishes between a two-piece container with an "upper housing" and a one-piece container without an "upper housing." Accordingly, the person of skill in the art would understand that the "upper housing" limitation requires a two-piece container having an "upper housing" and a separate and distinct "base." *See Eon-Net*, 653 F.3d at 1323.

The logic and conclusion of this Court's claim construction analysis in the *Zircon* case is directly on point here. In *Zircon*, the disputed claim term was "ratio." 452 F. App'x. at 971. The patentee argued that the term "ratio" (here, "upper housing") should be broadly construed to encompass either subtraction or division (here, one- or two-piece containers), whereas the defendant argued that the term should be limited to only division. *Id*. at 971-72. Based almost exclusively on the specification, this Court agreed with the defendant and limited the claim term "ratio" to division. *See id*. at 978.

As part of its analysis, this Court acknowledged that "the specification discloses embodiments . . . that employ either division or subtraction." *Id*. at 976. However, this Court found that "[t]he specification repeatedly and consistently uses the word 'ratio' to describe division" and that "the specification does not use the term 'ratio' to describe subtraction." *Id*. at 976-77. This Court further found

that the specification included an "explicit distinction" between products derived using division versus using subtraction. *Id*. at 977.

In summarizing the teachings of the specification, this Court stated:

> The fact that the specification discloses both division and subtraction methodologies does not necessarily mean that "ratio" means either division or subtraction. The key to answering this question is determining how the '091 patent uses the term "ratio." As discussed above, the '091 patent only uses the term "ratio" when it means division. The specification never uses the term "ratio" to describe subtraction. "Ratio" cannot, therefore, be construed to encompass both division and subtraction, regardless of whether both methodologies are otherwise disclosed in the specification.

*Id*. at 978.

This Court should apply the same analysis here as it did in *Zircon* and find that the specification of the '137 Patent supports the District Court's construction of "upper housing portion." *See id*. at 978; *see also Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004) (construing the claim terms "electrical operating unit" and "pair of . . . probe networks" to be "separate" and "distinct" where "the specification plainly describes the two components as separate" and "[n]othing in the descriptions of those two components suggests that their structures or functions overlap").

## B.    The Language Of The Asserted Claims Supports The District Court's Construction

As noted above, all the '137 Patent claims require "an upper housing portion of the container." The plain and ordinary meaning of the term "housing" in this

limitation indicates that the "upper housing" is a thing—*i.e.*, a piece of the container.  As the District Court correctly noted, "[t]he dictionary definition of 'housing' is '***something*** that covers or protects.'"  A0013 (citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 603 (11th ed. 2006)) (emphasis added).

In addition, the "upper housing" limitation is recited in subpart "a)" of independent Claims 1 and 7, while the "container base" is recited in subpart "b)."  *Compare, e.g.*, *id*. at Claim 1, 6:53-54 ("***a)*** the lid is attached by a hinge to an ***upper housing*** portion of the container") with *id*. at Claim 1, 6:58 ("***b)*** the container has a ***container base***") (emphasis added).  The separation of these two structural limitations within the claims indicates that these two elements are separate and distinct pieces of the claimed container.  *See Shire Dev., LLC v. Watson Pharm., Inc.*, 746 F.3d 1326, 1332 (Fed. Cir. 2014) ("Element (a) of claim 1 recites 'an inner lipophilic matrix.'  Element (b) of claim 1 separately recites 'an outer hydrophobic matrix.'  The separation of these elements within the claims indicates that the claim requires two separate matrices."), *vacated on other grounds*, 135 S.Ct. 1174 (2015) (remanding for further consideration in light of *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831 (2015)); *see also Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1299-1300 (Fed. Cir. 2005) ("[T]he structure . . . of claim 1 indicate[s] that the point-of-sale assembly and dispensing means constitute separate components" because

"[t]he POS assembly is recited in subpart A of claim 1, while the 'means for dispensing' are claimed in subpart B.").

Moreover, nothing in the claim language suggests that these two separate and distinct pieces of the container can be integrated into a one-piece container. *See, e.g.*, A0054-55 at Claim 1.

This Court's opinion in *Gaus* is instructive here. In *Gaus*, the asserted claims recited that the "housing" of the claimed apparatus includes "an electrical operating unit and a pair of spaced-apart electrically exposed conductive probe networks." 363 F.3d at 1288. Based on that claim language, this Court found that "the clear implication . . . is that the pair of probe networks is a distinct component, separate from the electrical operating unit of the claimed invention." *Id.* In reaching its conclusion, this Court reasoned that "[t]he claim lists the 'electrical operating unit' separately from the 'pair of . . . probe networks,' and does not suggest that the 'pair of . . . probe networks' consists in part of a portion of the 'electrical operating unit.'" *Id.*

The same is true here. The asserted claims of the '137 Patent recite that the "container" of the claimed assembly includes "an upper housing" and "a container base." As in *Gaus*, the asserted claims here list these components separately and do not suggest that either of these components is part of the other. Accordingly,

the asserted claims of the '137 Patent should be construed so that the "upper housing" is separate and distinct from the "container base."

Further, a comparison of the asserted claims of the '137 Patent with the related claims of the parent '720 Patent illustrates that the asserted claims require a two-piece container with separate and distinct "upper housing" and "container base" pieces:

| Claim 1, '137 Patent | Claim 1, '720 Patent |
|---|---|
| 1. A substantially moisture tight container and lid assembly for storing and packaging moisture-sensitive items comprising:<br><br>an assembly with *a container* and a lid,<br><br>  **a)** the lid is attached by a hinge to *an upper housing* portion of the container . . .<br><br>  **b)** the container has *a container base* . . . . | 1. A substantially moisture tight container and cap assembly for storing and packaging moisture-sensitive items comprising an assembly with *a container* and a cap, the cap is attached by a hinge to the container, the container has *a container base* . . . . |

A0054 at Claim 1, 6:53-58 (emphasis added); A1478 at Claim 1, 7:27-29 (emphasis added). As shown above, unlike the asserted claims of the '137 Patent, the claims of the '720 Patent are not limited to a container with an "upper housing" and a separate and distinct "container base." In fact, the claims of the '720 Patent do not require an "upper housing" at all. Rather, the claims of the '720 Patent merely require a container with a "container base."

- 27 -

Accordingly, while the claims of the parent '720 Patent are broad enough to cover both one- and two-piece containers, the asserted claims of the '137 Patent are not because they require an "upper housing." *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) (relying on the doctrine of claim differentiation to find that the claims of a parent and a continuation patent had different claim scope because "independent claim 12 of the parent '164 patent recites 'a split circular spring metal adaptor,' while claim 8 of the [continuation] '050 patent omits the 'split' modifier. Thus, unlike the adaptor of claim 12 . . . , the spring metal adaptor of claim 8 can either be split or unsplit." (internal citation omitted)).

Had CSP wanted to claim the same container in the '137 Patent that it claimed in the parent '720 Patent, it could have, but it chose not to. Instead, in the '137 Patent, CSP intentionally claimed a two-piece container with an "upper housing" and a separate and distinct container "base." CSP "need not have included this limitation in its claim;" however, "[h]aving done so, it must live with the language it chose." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1583 (Fed. Cir. 1996); *see also Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1372 (Fed. Cir. 2004) (finding that the patentee "chose to use the word

'polygonal'" and that "[t]he district court was not free . . . to excuse the patentee

from the consequences of its own word choice.").[3]

## C. The Prosecution History Further Confirms That The "Upper Housing" Limitation Should Be Construed To Require A Two-Piece Container

The '137 Patent, which was filed on June 30, 2005, is a continuation-in-part

of the '720 Patent, which was filed on October 10, 2003.  A0041, ¶¶ 22, 63.  The

parent '720 Patent did not contain the disputed claim term "upper housing."  *See*

A1464-1478.  Instead, the "upper housing" term was added to the specification and

claims of the '137 Patent when CSP filed the '137 Patent as a continuation-in-part

of the '720 Patent.  A comparison of the '720 and '137 Patents illustrates that CSP

added the claim term "upper housing" to the '137 Patent specification eleven (11)

times (not including the claims).  *Compare* A0041-55 *with* A1464-1478; *see also*

A1809-17.  As one example, CSP made the following changes to the specification

of the '720 Patent when it filed the '137 Patent:

> In yet another embodiment, the container assembly comprising the base and upper housing portion can be molded separately. As such, in one example, the containerbase portion can be loaded with the item(s) to be retained in the container assembly, and then the container and capupper housing portion can be snap-fit together and/or welded,with the base by employing a lip seal mechanism in order to provide

---

[3] Notably, in the continuation of the '137 Patent, the '778 Patent (A3965-84), CSP included a claim that is expressly limited to a one-piece container.  *See* A3983 at Claim 6 (claiming "wherein the container is a single piece container").  Significantly, this one-piece container claim does not include an "upper housing" limitation.  *Id.*

moisture-tightness. ~~In yet another embodiment, the cap and container portions can be formed as separate parts, loaded with the desired item~~ <u>Consequently</u>, the container and ~~cap~~<u>lid assembly</u> can be fit together, and the parts joined <u>without the need for additional sealing methods</u>, e.g., by welding (such as by sonic welding or by thermal welding).

*Compare* A1477 at 5:8-17 *with* A0053 at 4:7-16 (additions underlined, deletions stricken through); *see also* A1814. These changes to the '137 Patent, like all the other "upper housing" additions, indicate a deliberate action on the part of CSP to describe a two-piece container with an "upper housing" that is separate and distinct from the container "base," and to distinguish such a two-piece container from a one-piece container without an "upper housing."

CSP's intentional use of "upper housing" only in connection with two-piece containers is also reflected in Figure 14, which was added when CSP filed the '137 Patent. The '137 Patent describes Figure 14 as "a cross-sectional view of an enlarged section of one end of the ***base and upper housing assembly*** illustrating the snap lip seal" in which "the base portion is snap sealed with the upper housing portion." A0053 at 3:7-9 and 4:27-28.

Not surprisingly, the claims originally filed in the '137 Patent reflect the changes that CSP made to the specification in that they all required a two-piece container with the newly added "upper housing" term. For example, claim 1 as originally filed in the '137 Patent recited:

What is claimed is:

> 1. A substantially moisture tight container and lid assembly for storing and packaging moisture-sensitive items comprising an assembly with a container and a lid, the lid is attached by a hinge to an ==upper housing== portion of the container, the container has a container base, and a sidewall depending upwardly from the base, a top container . . . .

See A4177 at Claim 1, lines 1-5 (emphasis added).

Two years later, however, on July 19, 2007, CSP amended the claims to remove the "upper housing" limitation from the claims:

> 1. (Currently Amended) A substantially moisture tight container and lid assembly for storing and packaging moisture-sensitive items comprising an assembly with a container and a lid, the lid is attached by a hinge to an ~~upper housing~~ ~~portion of~~ the container, the container has a container base, and a sidewall extending upwardly from the <u>container</u> base, a top container . . . .

A4233-38, at A4234 (emphasis added). By removing the "upper housing" limitation, CSP broadened the then pending claims to cover a one-piece container without an "upper housing."[4]

But then on August 21, 2008, CSP changed its mind and added the "upper housing" limitation back into the pending claims, thereby limiting the claims again to a two-piece container with an "upper housing" that is separate and distinct from

---

[4] On July 19, 2007, the pending claims of the '137 Patent used nearly the same language as the parent '720 Patent. See A1478 at Claim 1, 7:27-29 ("[A]n assembly with a container and a cap, the cap is attached by a hinge to the container, the container has a container base . . . .").

the "container base." A4287-93.[5]  At the same time, CSP added a new claim that also included the "upper housing" limitation:

> 9. (New) A substantially moisture tight container and lid assembly for storing and packaging moisture-sensitive items comprising:
>
> an assembly with a container and a lid,
>
> a) the lid is attached by a hinge to an <mark>upper housing</mark> portion of the container, the lid has an outer periphery that extends over at least a portion of the container, the lid is provided with a skirt that extends downwardly therefrom,
>
> b) the container has a container base, and a sidewall extending upwardly from the container base,
>
> . . . .

A4290 (emphasis added).  And in three subsequent submissions, from August 21, 2008 to April 14, 2009, CSP provided the Patent Office with a claim listing wherein all of the claims required a two-piece container with an "upper housing" and a separate and distinct "base." *See* A4302-09; A4318-24; A4336-43.

Finally, on May 26, 2009, the asserted claims issued with the "upper housing" limitation:

---

[5] While CSP added back the "upper housing" claim limitation to require a two-piece container, CSP did not add back the specific "snap fit" mechanism for joining the two claimed pieces. *Compare* A4234-35 at Claim 1 *with* A4288-89 at Claim 1.  In other words, the amended claims require a two-piece container but the connection between the claimed "upper housing" and "base" pieces is not necessarily limited to a specific "snap fit" mechanism.

   **1.** A substantially moisture tight container and lid assembly
for storing and packaging moisture-sensitive items compris-
ing:
      an assembly with a container and a lid,
         a) the lid is attached by a hinge to an <mark>upper housing</mark>
            portion of the container, the lid has an outer periphery
            that extends over at least a portion of the container, the
            lid is provided with a skirt that extends downwardly
            therefrom,
         b) the container has a container base, and a sidewall
            extending upwardly from the container base,
   . . . .

A0054 at Claim 1, 6:49-59 (emphasis added); *see also* A0055 at Claim 7, 8:19-29.

   Because CSP added the "upper housing" term to the specification of the

'137 Patent, and ultimately decided to amend the claims to require a container with

the "upper housing" limitation, one of ordinary skill in the art reading the file

history would understand that CSP intentionally limited the claims to a two-piece

container with an "upper housing" and a separate and distinct "base" (and

deliberately chose not to claim a one-piece container).  *See Sun Pharm. Indus., Ltd.*

*v. Eli Lilly & Co.*, 611 F.3d 1381, 1388-89 (Fed. Cir. 2010) (finding that, during

claim construction, a patentee "cannot avoid" material added to the specification in

a continuation-in-part application); *Zircon*, 452 F. App'x at 978 (finding that

"[o]ne of ordinary skill in the art reading the file wrapper of this patent would

believe that [patentee] disavowed subtraction from the scope of its claims" because

"it is clear that [patentee] knew how to broadly claim division or subtraction as

computing methods, yet it amended all of its independent claims to require

- 33 -

[division]"); *see also Smith v. Magic City Kennel Club, Inc.*, 282 U.S. 784, 790 (1931) (finding that claim limitations added by patentee during prosecution "must be strictly construed against the inventor and looked upon as disclaimers").

In light of the overwhelming intrinsic evidence, it is clear that the District Court correctly construed "an upper housing portion of the container" to mean "an upper housing portion of the container that is separate and distinct from the container base."

## II.    CSP'S INTERPRETATION OF THE "UPPER HOUSING" LIMITATION VIOLATES THE PRINCIPLES OF CLAIM CONSTRUCTION AND IS BASED ON AN INCORRECT READING OF THE '137 PATENT

### A.    CSP's Construction Improperly Reads The Term "Housing" Out Of The Claims

According to CSP, the "plain and ordinary meaning" of the claim limitation "an upper housing portion of the container" is "a portion of the container located at the upper end of the container."  CSP Brief at p. 27.  In other words, CSP argues that the "upper housing" limitation merely describes a location (or area) on the container.  As the District Court correctly recognized, however, CSP's construction "would hold more weight were the term 'housing' not included in the disputed phrase."  A0013.  Indeed, CSP completely ignores the term "housing," which was added to the specification and claims of the '137 Patent to distinguish two-piece

containers with an "upper housing" from one-piece containers without an "upper housing." Thus, CSP's construction is improper and should be rejected.

By ignoring the claim term "housing," CSP improperly attempts to rewrite the "upper housing" limitation as "an upper ~~*housing*~~ portion of the container." Had CSP wanted to amend the claims in this way it needed to do so during prosecution of the '137 Patent, not now during litigation of its issued patent. *See Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 647 (Fed. Cir. 1994) (finding that "[patentee] cannot, in effect, rewrite its patent claims to suit its needs in this litigation."). And, as explained above, CSP had ample opportunity during prosecution to amend the claims in this regard. Indeed, CSP initially claimed a container with an "upper housing," but then chose to temporarily remove the "upper housing" limitation from the claims via amendment. Ultimately, however, CSP decided to add the "upper housing" limitation back into the claims prior to issuance. CSP "need not have included this limitation in its claim. Having done so, it must live with the language it chose." *Ethicon Endo-Surgery*, 93 F.3d at 1583.

CSP's attempt to read the term "housing" out of the claims is directly contrary to this Court's precedent requiring all claim terms to be given meaning. *See, e.g.*, *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim

- 35 -

is preferred over one that does not do so."); *Ethicon Endo-Surgery*, 93 F.3d at 1582 (refusing to "read [claim] limitation out of the claim"); *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) ("We must give meaning to all the words in Exxon's claims.").

Put another way, CSP's attempt to rewrite the "upper housing" limitation as "an upper portion of the container" improperly renders the claim term "housing" superfluous. *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330-31 (Fed. Cir. 2008) (rejecting proposed construction that "render[ed] the claim term 'local' superfluous" because the "proposed construction ascribes no meaning to the term 'local' not already implicit in the rest of the claim").

This Court's recent decision in *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014) highlights the defect in CSP's proposed construction. In *Apple*, the asserted claim recited "*routines* including an *analyzer server* for *detecting structures* in the data, and for *linking actions* to the detected structures." *Id*. at 1305 (emphasis in original). In contrast, Apple's proposed construction recited "program *routines* that *detect structures* and *links actions* to the detected structures, without any mention of 'analyzer servers.'" *Id*. (emphasis in original). This Court rejected Apple's proposed construction "because it reads 'analyzer server' out of the claim." *Id*. More specifically, this Court found that:

> Apple's construction essentially takes the claim text and removes the "analyzer server," leaving the rest basically unchanged. Thus,

> Apple's construction conflicts with the claim language by ignoring the
> claim term "server."

*Id.*

This Court's decision in *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361

(Fed. Cir. 2005) also illustrates the problem with CSP's construction.  In

*Callicrate*, this Court rejected a construction of the term "preformed endless loop"

"because it reads out the 'preformed' limitation and thus transforms the limitation

into simply an 'endless loop.'"  427 F.3d at 1369.[6]

Here, like the patentees' proposed constructions in *Apple* and *Callicrate*,

CSP's construction of the "upper housing" limitation should be rejected because it

reads the term "housing" out of the claim and conflicts with the claim language.

When the "upper housing" limitation is properly considered in the context of the

intrinsic evidence, it is clear that the claim limitation requires an "upper housing"

that is separate and distinct from the "container base"—it is not merely "a portion

of the container located at the upper end of the container," as CSP asserts.  CSP

Brief at p. 27.

---

[6] *See also Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909-10
(Fed. Cir. 2005) (reversing the district court's claim construction in part because it
read "substantially flattened" as "flat," effectively ignoring the "substantially"
qualifier in the claim).

**B.    CSP's Construction Improperly Relies On The Term "Portion"**

CSP also appears to rely on the term "portion" to support its assertion that "an upper housing portion of the container" is merely a location (or area) on the container.  *See* CSP Brief at p. 27 ("[T]he claim language itself makes clear that the upper housing ***portion*** of the container is just that—a portion of the container located at the upper end of the container.") (emphasis in original).  The term "portion," however, does not support CSP's position.  The '137 Patent specifically uses the term "portion" in connection with both the "upper housing portion" and the "base portion" to describe ***pieces*** of a container assembly, not merely locations on the container:

> [T]he container assembly comprising the base and ***upper housing portion*** can be ***molded separately***.  As such, in one example, the ***base portion*** can be loaded with the item(s) to be retained in the container ***assembly***, and then the ***upper housing portion*** can be ***snap-fit with*** the base . . . .

A0053 at 4:7-12 (emphasis added).

The '137 Patent also repeatedly uses the term "portion" when describing other pieces of the container.  For example, with reference to Figure 1, the '137 Patent describes both the lid 12 and the container 14 as separate "portion[s]" (*i.e.*, pieces) of the assembly:  "In one embodiment, the assembly 10 is generally provided with a ***lid portion 12*** and ***container portion 14*** that are attached by a hinge 16."  A0053 at 3:21-23 (emphasis added).  As shown in Figure 1, these

"portion[s]" are not merely locations on the container—they are physical pieces of

the container:



FIG. 1

A0042 at Figure 1 (annotated).

Accordingly, CSP's attempt to construe the "upper housing" limitation as

merely a location on the container should be rejected. "An upper housing portion

of the container" is a piece of the container that is separate and distinct from the

"container base" piece—it is not merely "a portion of the container located at the

upper end of the container," as CSP asserts. CSP Brief at p. 27.

**C.     The '137 Patent Does Not Disclose A One-Piece Container With An "Upper Housing"**

To support its position that the "upper housing" limitation covers both one- and two-piece containers, CSP relies heavily on the one-piece container disclosed in Figures 10 and 11 of the '137 Patent, including statements in the specification and prosecution history that are allegedly related to that embodiment. However, the one-piece container disclosed in the '137 Patent does not support CSP's position.

*First*, CSP argues that "one-piece and two-piece containers are covered by the invention" of the '137 Patent because "Figures 10 and 11 disclose a vial-shaped, one-piece container where the upper housing portion is not separate and distinct from the container base portion." CSP Brief at p. 27 (emphasis omitted); *see also id* at p. 30 ("Figure 10 discloses a vial-shaped container in which the upper housing portion and container base are a one-piece integral unit."). CSP is wrong because, as explained above, the one-piece container of Figures 10 and 11 does not have an "upper housing." A0041-55; *see also* CSP Brief at p. 31 (CSP admitting that "the specification does ***not*** specifically use the phrase 'upper housing portion' in the section of the specification describing the one-piece vial shown in Figure 10." (emphasis added)). There is no evidence in the intrinsic record to support CSP's assertion that the one-piece embodiment of Figures 10 and 11 has an "upper housing" and an integral "container base."

- 40 -

*Second*, CSP points to the following statement in the specification as intrinsic evidence supporting its construction:  "In one embodiment, the containers can be formed as a single closed unit, with the hinge joining the lid portion to the container portion."  CSP Brief at p. 28.  This statement, however, does not support CSP's assertion because it does not even mention the term "upper housing."  To the contrary, it is the sentence following this statement in the '137 Patent specification that actually describes the claimed "upper housing":

> In yet another embodiment, the container assembly comprising the base and upper housing portion can be molded separately.  As such, in one example, the base portion can be loaded with the item(s) to be retained in the container assembly, and then the upper housing portion can be snap-fit with the base . . . .

A0053 at 4:7-12.  This statement describes the claimed "upper housing" and "base" as two separate and distinct pieces of the container that can be assembled together.  In fact, when these two contrasting statements are taken together, it is clear that the one-piece container embodiment does not have an "upper housing."

*Third*, CSP relies on a statement that it made during the prosecution of the '137 Patent:  "Support for the limitation of 'a top of the container is provided with ***an opening*** that permits access to an interior of the container' can be found, for example, in Figure 10."  CSP Brief at p. 30  (emphasis added) (quoting A4292).  However, like the statements CSP points to in the specification, this prosecution history statement has nothing to do with the "upper housing" limitation of the

asserted claims.  Rather, this statement focuses solely on the container "opening,"

which is not at issue here.

**III.    THE DISTRICT COURT DID NOT IMPROPERLY RELY ON EXTRINSIC EVIDENCE, MISREAD THE CLAIMS, IMPORT LIMITATIONS FROM THE SPECIFICATION, OR EXCLUDE A PREFERRED EMBODIMENT**

### A.    The District Court's Dictionary Use Was Proper

The District Court did not "legally err[] by relying on a dictionary

definition" of the term "housing," as CSP asserts.  CSP Brief at p. 36.  Instead, the

District Court properly considered the Merriam-Webster definition of "housing" to

assist in its understanding of the common meaning of the "upper housing"

limitation.  *See Phillips*, 415 F.3d at 1322 ("Dictionaries or comparable sources are

often useful to assist in understanding the commonly understood meaning of words

. . . .").  Specifically, after noting that the inventors did not explicitly define

"housing" in the specification or prosecution history, the District Court cited a

dictionary definition of "housing," *i.e.*, "***something*** that covers or protects."

A0013 (emphasis added).  As explained above, the dictionary definition of

"housing" is fully consistent with the meaning that is clear and unambiguous in

light of the intrinsic evidence—that the "upper housing" is a piece (something) of

the container separate and distinct from the "container base."

The District Court's approach here was in line with precedent from this

Court:

> Nor is the court barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence.  For example, a judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term.

*Id*. at 1324 (internal citation omitted); *see also Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1325 (Fed. Cir. 2008) (rejecting argument "that the district court improperly relied on an abstract dictionary definition . . . ."); *Mangosoft*, 525 F.3d at 1330 (recognizing that "reference to [dictionaries] is not prohibited . . . .").[7]

Moreover, contrary to CSP's suggestion, this is a "subsidiary factfinding" based on extrinsic evidence that "must be reviewed for clear error on appeal." *Teva*, 135 S.Ct. at 841.  And since this factual finding by the District Court is fully consistent with the intrinsic record, it does not constitute clear error.

## B.    The District Court's Reading Of The Asserted Claims Was Correct

CSP also argues that the District Court legally erred by relying on subparts a) and b) of asserted claim 1 to find that the "upper housing" and "container base" "must necessarily be separate and distinct."  CSP Brief at p. 38.  But, the District

---

[7] Moreover, to the extent CSP is arguing that the District Court erred by considering the dictionary definition too early in its claim construction analysis, CSP is wrong.  This Court has found that "[j]udges are free to consult such resources at any time . . . ."  *See Vitronics*, 90 F.3d at 1584 n. 6; *see also Phillips*, 415 F.3d at 1324.

Court never stated that the "upper housing" and "container base" "must necessarily be separate and distinct" because of subparts a) and b).  Rather, the District Court correctly recognized that the "upper housing" piece is recited in subpart a) of the asserted claims, while the "container base" piece is recited in subpart b).  *See* A0014.  As explained above, the fact that these two container pieces are recited in different subparts of the asserted claims supports the District Court's construction as requiring a two-piece container with an "upper housing" that is separate and distinct from the "container base."  *See Shire Dev.*, 746 F.3d at 1332; *Default Proof*, 412 F.3d at 1299-1300.

## C.    The District Court Did Not Import A Limitation From The Specification Into The Claims

The District Court's construction of the "upper housing" limitation is not "contrary to the well-established rule of not reading a limitation from the specification into the claims," as CSP suggests.  CSP Brief at p. 38.  Instead, the District Court relied on "the single best guide to the meaning of a disputed term"— the specification.  *Phillips*, 415 F.3d at 1315.  Here, the specification of the '137 Patent "unequivocally compels the construction[] adopted by the district court." *Eon-Net*, 653 F.3d at 1323 (relying on the specification to support construction and rejecting argument that the "district court improperly imported a limitation from the specification" into the claims); *see also Ethicon Endo-Surgery*, 93 F.3d at 1578 (finding that "the district court did not import an additional limitation into the

claim; instead, it looked to the specification to aid its interpretation of a term already in the claim, an entirely appropriate practice."); *Laserfacturing*, 494 F. App'x at 75 (finding that "[t]he district court did not import the specification's limitations or preferred embodiments. Instead, the court gave meaning to the term as it was used throughout the specification.").

In cases like this, where the patentee repeatedly and consistently describes a claim term one way, this Court has construed the claim term in accordance with the specification and rejected the exact argument CSP makes in this case. *See Eon-Net*, 653 F.3d at 1321-23 (rejecting argument that the "district court improperly imported a limitation from the specification" into the claims where the specification "repeatedly and consistently" described the term as construed); *ICU Med.*, 558 F.3d at 1374-75 (rejecting argument that construction improperly imported a limitation from the specification into the claims where the specification "repeatedly and uniformly" described the term as construed) (internal quotation marks omitted); *Bell Atl. Network*, 262 F.3d at 1270-73 (rejecting argument that construction "improperly imported the limitations of one embodiment into the claim term" where "the patentees defined the term 'mode' by implication, through the term's consistent use throughout the '786 patent specification." (citing *Vitronics*, 90 F.3d at 1582)); *Laserfacturing*, 494 F. App'x at 75 (finding that "[t]he district court did not import the specification's limitations or preferred

embodiments" into its construction of "sheets" where "[t]he patent consistently discusses the term 'sheets' according to its plain and ordinary meaning.").

### D.    The District Court's Claim Construction Does Not Exclude A Preferred Embodiment

Contrary to CSP's assertion, the District Court's construction of the "upper housing" limitation does not "exclude[] a preferred embodiment from the claim scope." CSP Brief at p. 39.

*First*, CSP's argument relies on an alleged disclosure in the '137 Patent that does not exist, *i.e.*, a disclosure of a one-piece container with an "upper housing." *See, e.g.,* CSP Brief at pp. 27-34. As explained above, the '137 Patent does not disclose or suggest a one-piece container with an "upper housing." To the contrary, the '137 Patent expressly distinguishes between a one-piece container without an "upper housing" and a two-piece container with an "upper housing." *See, e.g.,* A0053 at 4:4-12. And every time the '137 Patent uses the term "upper housing," it is in the context of a discussion of a two-piece container. A0014; *see also* A0041 at Abstract; A0052 at 2:26-30; A0053 at 3:7-9; A0053 at 4:7-12; A0053 at 4:18-28.

*Second*, the one-piece container disclosed in Figures 10 and 11 of the '137 Patent is not the "preferred embodiment" that CSP suggests. In fact, the '137 Patent does not refer to any embodiments as being "preferred." *See* A0041-55. However, to the extent the '137 Patent has a preferred embodiment, it is the two-

piece container shown and described with reference to Figures 1-9 and 12-14—not the one-piece container shown only in Figures 10 and 11.

For example, in the Brief Description of the Drawings, Figures 1-9 are described as views of "a container of the present invention," whereas Figures 10 and 11 are described as views of "another embodiment of a container of the present invention." A0052, 2:45 – A0053, 3:2. Further telling is the fact that the European counterpart to the '137 Patent, European Patent No. 1 567 425, states that the container and lid assembly of Figures 10 and 11 is "not part of the present invention." A2611-34 at A2612, 2:11-15.

*Third*, while there is precedent cautioning against a claim construction that excludes a "preferred" embodiment disclosed in the specification, this Court has affirmed numerous claim constructions in which disclosed embodiments were not covered by the scope of the claims. *See, e.g.*, *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) (affirming district court's claim construction that did "not cover the preferred embodiment or the other illustrated embodiments" and stating that "[t]he patentee chooses the language and accordingly the scope of his claims."); *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215-16 (Fed. Cir. 2008) (affirming district court's claim construction despite "not [being] supported by the sole embodiment described in the specification" and noting that "where we conclude that the claim language is

unambiguous, we have construed the claims to exclude all disclosed

embodiments.").

## IV.   THE DISTRICT COURT CORRECTLY BARRED CSP FROM ASSERTING INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

Under the proper construction of "an upper housing portion of the

container," CSP is barred from asserting the doctrine of equivalents against

Clariant's accused one-piece container on two independent bases:  (1) the

disclosure-dedication rule and (2) the vitiation doctrine.  A0036.  Either provides a

sufficient basis for affirmance.

### A.   The Disclosure-Dedication Rule Bars CSP From Asserting Infringement Under The Doctrine Of Equivalents

#### 1.   The Disclosure-Dedication Rule

The disclosure-dedication rule bars infringement under the doctrine of

equivalents when "particular subject matter [has been] disclosed in the patent

specification but not claimed . . . ."  *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356,

1368 (Fed. Cir. 1999); *see also Miller v. Bridgeport Brass Co.*, 104 U.S. 350, 352

(1881) ("[T]he claim of a specific device or combination, and an omission to claim

other devices or combinations apparent on the face of the patent, are, in law, a

dedication to the public of that which is not claimed.").  In such situations, the

unclaimed subject matter "is deemed to have been surrendered [to the public]," and

a patentee "cannot assert the doctrine of equivalents to cover the disclosed but

unclaimed" matter. *See K-2*, 191 F.3d at 1368; *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1055 (Fed. Cir. 2002) (*en banc*); *see also PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1355-56 (Fed. Cir. 2004) ("[A] patent applicant who discloses but does not claim subject matter has dedicated that matter to the public and cannot reclaim the disclosed matter under the doctrine of equivalents."); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1106-108 (Fed. Cir. 1996) (holding that under the "well-established rule that subject matter disclosed but not claimed in a patent application is dedicated to the public," the accused infringer could not, as a matter of law, infringe under the doctrine of equivalents by using the disclosed but unclaimed system) (internal quotation marks omitted).

Application of the doctrine of equivalents to recapture subject matter deliberately left unclaimed would "conflict with the primacy of the claims in defining the scope of the patentee's exclusive rights." *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997) (citing *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29 (1997)); *see also Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562 (Fed. Cir. 1994) ("The doctrine of equivalents cannot be used to erase 'meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.'" (internal citations omitted)).

"The disclosure-dedication rule limits application of the doctrine of equivalents, much in the same way as prosecution history estoppel." *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1331 (Fed. Cir. 2004). Under both rules, resort to the doctrine of equivalents is precluded, as a matter of law, based on the actions of the patentee during prosecution evincing a surrender or dedication of subject matter. *Id*.

Whether the disclosure-dedication rule applies to a specific situation is straightforward—"if one of ordinary skill in the art can understand the unclaimed disclosed teaching upon reading the written description, the [unclaimed] alternative matter disclosed has been dedicated to the public." *PSC*, 355 F.3d at 1360. This is certainly the case here with respect to the unclaimed one-piece container, as explained below.

### 2.    CSP Disclosed But Did Not Claim An Alternative One-Piece Container Like Clariant's Accused Product

The '137 Patent discloses two different types of containers: (i) *a two-piece container* (*i.e.*, a multipart container) with an "upper housing" and a separate and distinct "base"; and (ii) *a one-piece container* that does not have an "upper housing." These two different types of containers are shown in Figures 6 and 10, respectively:



A0047 at Figure 10 (annotated); A0044 at Figure 6 (annotated).

The '137 Patent also makes clear that these two types of containers are

alternatives to one another:

> *In one embodiment*, the containers can be formed as a *single closed unit*, with the hinge joining the lid portion to the container portion. *In yet another embodiment*, the container assembly comprising the *base and upper housing portion* can be molded *separately*.

A0053 at 4:4–9 (emphasis added).  Accordingly, the '137 Patent expressly teaches

that a container can be made as a single piece, or alternatively can be made as two

separate pieces that can be assembled together.

In its opening brief, CSP admits that the '137 Patent discloses one- and two-

piece containers as alternatives.  Specifically, CSP states that:

> After describing one-piece containers, the specification moves on to discuss two-piece containers.  The specification, however, makes it especially clear that two-piece containers are merely another example and are not the only embodiment or "the invention" . . . .  [The '137 Patent] clause that introduces containers having separate upper

> housing portions explicitly tells a person of ordinary skill in the art
> that other embodiments can be a one-piece integral container.

CSP Brief at pp. 28-29 (internal citation omitted).  Thus, by CSP's own admission, a person of ordinary skill in the art would understand that the '137 Patent discloses a one-piece container as an alternative to a two-piece container with an upper housing portion that is separate and distinct from a container base.

CSP and its expert, Dr. Osswald, also represented more than once to the District Court that both one- and two-piece containers are disclosed in the '137 Patent.  For example, during claim construction briefing, CSP argued that "while the specification does describe a two-piece container assembly, the specification also describes and depicts one-piece container assemblies."  *See* A3222.  Likewise, during summary judgment briefing, CSP asserted that "[m]aking containers out of one or two pieces is a well-known design choice in the industry and was disclosed in the 137 patent."  A3895 at ¶ 2; *see also* A3897 ("As explained by Dr. Osswald, manufacturing containers out of one or two pieces is a well-known design choice in the industry and the 137 patent specifically discloses both one-piece and two-piece embodiments."); A3919 at ¶ 27 (Dr. Osswald stating that "[m]anufacturing containers out of one or two pieces is well known in the industry and was disclosed in the 137 patent.").  Thus, both CSP and its expert acknowledge that one of ordinary skill in the art would understand that the one- and two-piece containers

disclosed in the '137 Patent are "well-known design **choice[s]**"—*i.e.*, alternative types of containers.

While it is clear that the '137 Patent discloses both one- and two-piece containers as alternatives, the '137 Patent claims only one of these container configurations—the two-piece container with an "upper housing." As a result, the disclosure-dedication rule bars CSP from using the doctrine of equivalents to reclaim the disclosed but unclaimed one-piece container and cover Clariant's Accused Product. CSP has dedicated such a container to the public.

This Court's *en banc* decision in *Johnson & Johnston* is directly on point. In that case, the patent-in-suit specifically limited the claims to an aluminum substrate. *Johnson & Johnston*, 285 F.3d at 1055. The specification of the patent, however, disclosed that "[w]hile aluminum is currently the preferred material for the substrate, other metals, such as stainless steel or nickel alloys may be used."

*Id*. This Court held that:

> [Since the patent-in-suit] disclosed without claiming the steel substrates, Johnston cannot now invoke the doctrine of equivalents to extend its aluminum limitation to encompass steel. Thus, Johnston cannot assert the doctrine of equivalents to cover the disclosed but unclaimed steel substrate.

*Id*. As in *Johnson & Johnston*, CSP cannot invoke the doctrine of equivalents in the present action to cover the disclosed but unclaimed one-piece container.

This Court also explained in *Johnson & Johnston* the lack of prejudice to the patentee when the disclosure-dedication rule is used to bar a patentee's use of the doctrine of equivalents:

> A patentee who inadvertently fails to claim disclosed subject matter, however, is not left without remedy. Within two years from the grant of the original patent, a patentee may file a reissue application and attempt to enlarge the scope of the original claims to include the disclosed but previously unclaimed subject matter. 35 U.S.C. § 251 (2000). In addition, a patentee can file a separate application claiming the disclosed subject matter under 35 U.S.C. § 120 (2000) (allowing filing as a continuation application if filed before all applications in the chain issue). Notably, Johnston took advantage of the latter of the two options by filing two continuation applications that literally claim the relevant subject matter.

*Id.*

Like the patentee in *Johnson & Johnston*, CSP has filed multiple continuation applications from the '137 Patent. One of those continuation applications issued as the '778 Patent, which expressly claims the one-piece container that CSP chose not to claim in the '137 Patent. *See* A3983 at Claim 6 (claiming "wherein the container is a single piece container"). Thus, as in *Johnson & Johnston*, using the disclosure-dedication rule to preclude the patentee CSP from relying on the doctrine of equivalents to reclaim a one-piece container does not result in any prejudice to CSP.

### 3.    The District Court's Claim Construction Is Not Inconsistent With Its Application Of The Disclosure-Dedication Rule

CSP's main argument against using the disclosure-dedication rule here is that the District Court's claim construction and its application of the disclosure-dedication rule are allegedly inconsistent.  Specifically, CSP argues that "[t]he disclosure-dedication doctrine is . . . inapplicable in this case" because, in construing the "upper housing" limitation, the District Court purportedly "found that the '137 patent does not specifically identify a one piece upper housing and base as an alternative to the upper housing claim limitation."  CSP Brief at pp. 41-42.  CSP's argument, however, is based on a false premise.

There is no dispute that the District Court correctly found that "each time the specification uses the term 'upper housing' . . . the specification describes the container as having an upper housing and a separate and distinct container base."  A14; CSP Brief at pp. 41-42.  But contrary to CSP's suggestion, this finding has no bearing on whether the '137 Patent discloses a one-piece container as an alternative to the claimed two-piece container.  Instead, the District Court's finding on claim construction simply confirms that the '137 Patent does not disclose a one-piece container with an "upper housing."

CSP's argument incorrectly assumes that in order for the '137 Patent to disclose a one-piece container as an "alternative" to the claimed two-piece container with an "upper housing" and separate and distinct "base," the one-piece

container must also have an "upper housing" and an integral "base."  In other

words, according to CSP, an alternative one-piece container must have the same

components as the claimed two-piece container, just integrally formed and not

separate.  This is not true.  As explained above, the '137 Patent expressly teaches

that a one-piece container without an "upper housing" (*e.g.*, Figure 10) is an

alternative to a two-piece container with an "upper housing" (*e.g.*, Figure 6).  *See,*

*e.g.,* A0053 at 4:4–9.

CSP's argument is analogous to saying that a shoe without laces (*e.g.*, a

loafer) cannot be an alternative to a shoe with laces (*e.g.*, an oxford).  However,

these are clearly alternative types of shoes even though they do not both have

laces.

Accordingly, the District Court's claim construction finding that the '137

Patent only uses the claim term "upper housing" to refer to a two-piece container is

not inconsistent with its finding under the disclosure-dedication rule that the '137

Patent discloses a one-piece container without an "upper housing" as an alternative

to the two-piece container with an "upper housing."

> ### 4.    CSP's Cases Confirm The Standard Set Forth In *Johnson & Johnston* and *PSC*

CSP argues that the disclosure-dedication rule "only" applies when

"unclaimed subject matter has been identified by the patentee as an alternative to a

claim limitation."  CSP Brief at pp. 40-41 (quoting *Pfizer, Inc. v. Teva Pharm.,*

*USA, Inc.*, 429 F.3d 1364, 1378-79 (Fed. Cir. 2005)).  To the extent CSP is arguing

that the disclosure-dedication rule requires something more than the standard set

forth by this Court in *Johnson & Johnston* and *PSC*, CSP is wrong.

Like *Johnson & Johnston* and *PSC*, the cases cited by CSP make clear that

the '137 Patent's disclosure of a one-piece container precludes application of the

doctrine of equivalents if that disclosure indicates to one of skill in the art that the

one-piece container is an unclaimed alternative to the claimed two-piece container.

Contrary to CSP's suggestion, there is no requirement under the disclosure-

dedication rule that the '137 Patent must explicitly recite the magic word

"alternative."

According to the *Pfizer* case cited by CSP, "in *PSC Computer Products* this

court answered the question of how specific a disclosure in a written description

must be to dedicate matter to the public . . . ."  *Pfizer*, 429 F.3d at 1378.  This

Court went on to quote the *PSC* opinion:

> We hold that if one of ordinary skill in the art can understand the
> unclaimed disclosed teaching upon reading the written description, the
> [unclaimed] alternative matter disclosed has been dedicated to the
> public . . . .

*Id.* (quoting *PSC*, 355 F.3d at 1360).  Likewise, this Court also quoted *PSC* in the

*SanDisk* case relied on by CSP:  "the disclosure must be of such specificity that

one of ordinary skill in the art could identify the subject matter that had been

disclosed and not claimed." *SanDisk Corp. v. Kingston Tech. Co., Inc.*, 695 F.3d 1348, 1363 (Fed. Cir. 2012) (quoting *PSC*, 355 F.3d at 1360).

Accordingly, CSP's cases confirm, rather than alter, the standard set forth in *Johnson & Johnston* and *PSC*.

In addition, the facts in the cases cited by CSP are easily distinguishable from the facts here. For example, the claims at issue in *Pfizer* required a "saccharide preventing hydrolysis." 429 F.3d at 1379. The defendant's accused product, however, used microcrystalline cellulose, which the defendant argued was a disclosed but unclaimed alternative. *Id*. This Court found that the disclosure-dedication rule did not apply because the specification did not disclose microcrystalline cellulose as an alternative:

> [Defendant] has not pointed to parts of the [asserted] patent where the inventors identify microcrystalline cellulose as an unclaimed alternative that would function as a "saccharide" preventing hydrolysis. . . . [W]hile Example C identifies microcrystalline cellulose as an ingredient in a particular formulation, we are not convinced that one of ordinary skill in the art would come to the conclusion that the inventors have identified microcrystalline cellulose in that formulation as an alternative to a "saccharide" that prevents hydrolysis.

*Id*. (internal citation omitted).

In contrast to *Pfizer*, the '137 Patent at issue here expressly identifies the unclaimed one-piece container as an alternative to the claimed two-piece container with an "upper housing" and a separate and distinct "base":

> *In one embodiment*, the containers can be formed as a *single closed unit*, with the hinge joining the lid portion to the container portion. *In yet another embodiment*, the container assembly comprising the *base and upper housing portion* can be molded *separately*.

A0053 at 4:4–9 (emphasis added). And as explained above, by CSP's own admission, "one of ordinary skill in the art would come to the conclusion" that this teaching (and others) in the '137 Patent discloses a one-piece container as an alternative to the claimed two-piece container. *See, e.g.,* CSP Brief at pp. 28-29; A3222; A3895 at ¶ 2; A3897; 3919 at ¶ 27. Thus, unlike in *Pfizer*, the dedication-disclosure rule applies here and CSP cannot use the doctrine of equivalents to recapture the unclaimed one-piece container.

The facts in *SanDisk* are similarly distinguishable. The *SanDisk* case addressed two different disclosure-dedication issues. The first issue involved the claim limitation requiring "programming . . . a logical page address associated with the original data." 695 F.3d at 1362. The defendant argued that the disclosure-dedication rule applied because a person of ordinary skill in the art could figure out how to make an unclaimed alternative by interpreting and implementing various disclosures in the patent, including Figure 9. *Id*. at 1362-64. This Court disagreed because:

> Neither Figure 9 nor any other portion of the specification identified by [defendant] refers to using an indication in the address that the block is sequentially programmed combined with programming a logical block address as an alternative to "programming ... a logical page address." Whether a person of ordinary skill ultimately could

employ the disclosures of the patent to implement a purported
equivalent does not amount to actually disclosing to one of ordinary
skill that equivalent "as an alternative to a claim limitation."

*Id*. at 1364 (quoting *Pfizer*, 429 F.3d at 1379).

In contrast to the asserted patent in *SanDisk*, the '137 Patent ***actually***

***discloses*** a one-piece container that lacks an "upper housing" as an alternative to

the claimed two-piece container.  The person of ordinary skill in the art does not

need to interpret any disclosures "to implement a purported equivalent."

The second issue in *SanDisk* addressed whether a patent incorporated by

reference could contain the unclaimed alternative.  *Id*. at 1366.  This Court refused

to apply the disclosure-dedication rule because "the [asserted] patent's discussion

of the incorporated . . . patent does not sufficiently identify to one of ordinary skill

that the incorporated patent contains subject matter that is an alternative to the

claimed controller."  *Id*. at 1366-67.  This issue is not present here—the '137

Patent itself contains a clear description of the unclaimed one-piece container.

### B.    The Vitiation Doctrine Bars CSP From Asserting Infringement Under The Doctrine Of Equivalents

#### 1.    The Vitiation Doctrine

Claim vitiation is "'a legal determination that the evidence is such that no

reasonable jury could determine two elements to be equivalent.'"  *Charles Mach.*

*Works, Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1380 (Fed. Cir. 2013) (quoting

*Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir. 2012)).  Under the

vitiation doctrine, "courts properly refuse to apply the doctrine of equivalents 'where the accused device contain[s] the antithesis of the claimed structure' . . . [because such application] would 'vitiate' a claim element." *Deere*, 703 F.3d at 1356 (quoting *Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1345 (Fed. Cir. 2006) and *Warner-Jenkinson*, 520 U.S. at 39 n.8). Application of the vitiation doctrine in the antithesis scenario "makes sense [because] two elements likely are not insubstantially different when they are polar opposites." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013).

This Court has repeatedly used the vitiation doctrine to preclude application of the doctrine of equivalents when the claimed and accused products are opposites. *See, e.g.*, *Planet Bingo*, 472 F.3d at 1345 (refusing to apply the doctrine where the proposed application would change "before" to "after," which was a "marked difference"); *Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005) (refusing to apply the doctrine where the proposed application would change "mounted" to "unmounted"); *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) (refusing to apply the doctrine where the proposed application would change "majority" to "minority"); *Wleklinski v. Targus, Inc.*, 258 F. App'x 325, 329-30 (Fed. Cir. 2007) (refusing to apply the doctrine where the proposed application would change "separate sections made of different materials" to "a single unitary material made of the same fabric").

- 61 -

### 2.    Clariant's Accused One-Piece Container Is The Antithesis Of The Claimed Multipart Container

While CSP acknowledges that the claim vitiation doctrine precludes application of the doctrine of equivalents when "the allegedly equivalent feature is the 'antithesis' of the claimed element," CSP nevertheless argues that Clariant's accused one-piece container is not the antithesis of the claimed multi-piece container. *See*, *e.g.*, CSP Brief at p. 45. CSP's argument has no merit.

The "upper housing" limitation of the '137 Patent claims requires a ***multi-piece*** container with at least two separate and distinct components—an "upper housing" and a "base." In contrast, Clariant's Accused Product is a ***one-piece*** container without an "upper housing." If a one-piece container were equivalent to a multi-piece container, as CSP argues, then the claims would cover all containers, effectively erasing (vitiating) the "upper housing portion" limitation. As such, the accused one-piece container is the antithesis (or fundamental opposite) of the claimed multi-piece container.

The facts here are nearly identical to the facts addressed by this Court in *Wleklinski*. The asserted patent in *Wleklinski* was directed to a shoulder strap used with, for example, a golf bag. The asserted claims were construed to require a strap with "separate sections made of different materials." 258 F. App'x at 329-30. In other words, the asserted claims in *Wleklinski* required a multi-piece shoulder strap. The accused shoulder strap, however, was made from "a unitary piece of

material"—*i.e.*, a one-piece shoulder strap. *Id.* at 327-29. This Court rejected the patentee's argument that the accused one-piece strap was functionally equivalent to the claimed multi-piece strap, finding instead that the accused one-piece strap was the "fundamental opposite" of the claimed multi-piece strap. *Id.* at 329-30. Thus, this Court affirmed summary judgment of non-infringement because "a finding of infringement under the doctrine of equivalents would impermissibly vitiate claim limitations." *Id.* at 330.

The similarities between *Wleklinski* and this case are clear. The claim constructions in both require a multi-piece configuration, while the accused products in *Wleklinski* and this case have one-piece configurations. Accordingly, the result here should be the same as the result in *Wleklinski*—Clariant's Accused Product is the "fundamental opposite" of the claimed multi-piece container and thus no reasonable juror could find infringement under the doctrine of equivalents.

### 3.    CSP's Expert's Doctrine of Equivalents Analysis Is Misleading

To support CSP's position that Clariant's accused one-piece container is not the opposite of the claimed multi-piece container with an "upper housing" and a separate and distinct "base," CSP points to a series of drawings prepared by its expert Dr. Osswald:



CSP Brief at p. 49; *see also id.* at p. 46 (referring to these figures as "one-piece, two-piece, and three-piece containers"). CSP relies on these figures to argue that one- and two-piece containers are not the antithesis of each other because, according to CSP and its expert, three-piece containers with an "upper housing" are also possible.

A close inspection of these figures, however, reveals that CSP has included the lid as one of its container pieces in order to make its argument. This is misleading because the lid is not part of the container as that term is used in the claims. As such, CSP's alleged "one piece" and "two piece" containers are both actually one-piece containers, and CSP's alleged "three piece" container is actually a two-piece container. Thus, CSP's figures only show two different container configurations—a one-piece container and a two-piece container with an "upper housing" and a separate and distinct "base." Moreover, CSP's suggestion that the container can be made of even more than two pieces, *i.e.*, "three-piece[s], or four-

piece[s], etc.," does not change the fact that a multi-piece container is still the

fundamental opposite of a one-piece container.  *See* CSP Brief at p. 46.

## CONCLUSION

The District Court correctly construed the claim limitation "an upper housing portion of the container" to mean "an upper housing portion of the container that is separate and distinct from the container base."  Under this construction, CSP conceded that there is no literal infringement of the asserted claims of the '137 Patent by Clariant's Accused Product.  Moreover, the District Court correctly barred CSP—based on the disclosure-dedication rule and/or the vitiation doctrine—from arguing that Clariant's Accused Product meets the claim limitation "an upper housing portion of the container" under the doctrine of equivalents.  Accordingly, the District Court's grant of summary judgment of noninfringement in favor of Clariant should be affirmed.

## **STATEMENT OF ORAL ARGUMENT**

Oral argument is respectfully requested.




Respectfully submitted,


Dated: May 13, 2015                    By: /s/Sean M. Sullivan

Sean M. Sullivan
J. Dan Smith
LEE SULLIVAN SHEA
   & SMITH LLP
150 South Wacker Drive
Chicago, IL 60606
(312) 754-9602

Paul H. Berghoff
Paula S. Fritsch
MCDONNELL BOEHNEN HULBERT
   & BERGHOFF LLP
300 S. Wacker Drive
Chicago, IL 60606
(312) 913-0001

*Attorneys for Defendants-Appellees*
*Süd-Chemie AG, Süd-Chemie, Inc.,*
*Airsec S.A.S., Clariant Produkte*
*Deutschland GmbH, Clariant*
*Corporation, and Clariant*
*Production (France) S.A.S.*

## **PROOF OF SERVICE**

I hereby certify that I filed the foregoing Brief for Appellees with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system this 13th day of May, 2015, and served a copy on counsel of record by the CM/ECF system.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with Federal Express Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

Dated: May 13, 2015        By: /s/Sean M. Sullivan
                          Sean M. Sullivan
                          LEE SULLIVAN SHEA
                            & SMITH LLP
                          150 South Wacker Drive
                          Chicago, IL 60606
                          (312) 754-9602

                          *Attorneys for Defendants-Appellees*
                          *Süd-Chemie AG, Süd-Chemie, Inc.,*
                          *Airsec S.A.S., Clariant Produkte*
                          *Deutschland GmbH, Clariant*
                          *Corporation, and Clariant*
                          *Production (France) S.A.S.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), the brief contains 13,209 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft® Word for Mac 2011 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


Dated: May 13, 2015          By: /s/Sean M. Sullivan
                                 Sean M. Sullivan
                                 LEE SULLIVAN SHEA
                                   & SMITH LLP
                                 150 South Wacker Drive
                                 Chicago, IL 60606
                                 (312) 754-9602

                                 *Attorneys for Defendants-Appellees*
                                 *Süd-Chemie AG, Süd-Chemie, Inc.,*
                                 *Airsec S.A.S., Clariant Produkte*
                                 *Deutschland GmbH, Clariant*
                                 *Corporation, and Clariant*
                                 *Production (France) S.A.S.*